

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-27-2005

# USA v. Hodge

Precedential or Non-Precedential: Precedential

Docket No. 02-1817

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Hodge" (2005). *2005 Decisions.* Paper 909.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/909

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No. 02-1817

UNITED STATES OF AMERICA

v.

DEVIN HODGE,
            Appellant

_____

On Appeal from the District Court of the Virgin Islands,
Division of St. Thomas and St. John
District Judge: The Honorable Thomas K. Moore
District Court No. 99-CR-00006-03

_____

Argued April 20, 2005

_____

Before: NYGAARD, RENDELL, and SMITH, *Circuit Judges*

(Filed: June 27, 2005)

1

Jorge E. Rivera-Ortiz
P.O. Box 1845
Manati, Puerto Rico 00674-1845
        *Attorney for Appellant*

Nelson L. Jones
Office of the United States Attorney
United States Courthouse
5500 Veterans Building, Ste. 260
Charlotte Amalie, St. Thomas
        USVI, 00802-6924
        *Attorney for Appellee*

_____

OPINION OF THE COURT

_____


SMITH, *Circuit Judge*.

Devin Hodge pleaded guilty to murdering the owner of a St. Thomas jewelry store. Devin's brother, Irvine, pleaded guilty to the same crime as part of a "package deal." The brothers were sentenced at the same proceeding to life in prison by the District Court of the Virgin Islands. Devin argues on appeal that the government breached its plea agreement, and that the District Court conducted a deficient plea colloquy in part because it was unaware that his plea was linked to his brother's. We hold that the government

2

breached its plea agreement, and we will vacate Devin's sentence and remand for re-sentencing or withdrawal of his plea. We further hold that the District Court did not plainly err in conducting Devin's plea colloquy. We write to provide guidance for the District Court should a new plea colloquy be required on remand, and for other district courts faced with the sensitive task of testing voluntariness in package deal plea situations.[1]

## I.

In May 1999, a federal grand jury indicted Devin Hodge, Irvine Hodge, and a third defendant for murder of the owner of the Emerald Lady Jewelry Store in Charlotte

---

[1]Devin also argues on appeal that the District Court erroneously adjusted his sentence upward under *Blakely v. Washington*, 524 U.S. 296 (2004). In the wake of *Booker v. United States*, 125 S. Ct. 738 (2005), normally we would remand his case to the District Court for re-sentencing. *See United States v. Davis*, 407 F.3d 162 (3d Cir. 2005). As we have explained, however, we remand for re-sentencing or plea withdrawal because we hold that the government breached its plea agreement with Devin in its allocution at his sentencing. To foreclose the government from repeating the infirm language at a possible re-sentencing, we will dispose of Devin's breach-of-plea argument now on the merits rather than remanding solely under *Booker*.

Amalie, St. Thomas, and the theft of jewelry from the store.[2] Devin pleaded not guilty to that indictment, which was styled as a second superseding indictment.[3] In March 2000, Devin pleaded not guilty to a third, superseding indictment.[4]

As early as mid-1999, however, at Devin's initiation, Devin and the government were engaged in intense

---

[2]These crimes may be related to earlier proceedings in this Court against Irvine for robbery of the same store three years earlier. At Devin's sentencing, the government stated that the murder at the Emerald Lady was prompted by Devin's "fantasy" that "he could make a difference in his brother's case by killing another human being." We affirmed the conviction and sentence of Irvine for armed robbery at the Emerald Lady in *United States v. Hodge*, 211 F.3d 74, 75 (3d Cir. 2000).

[3]The original indictment and first superseding indictment are not in the record. In the Second Superseding Indictment, the Hodge brothers and their co-defendant were charged with (1) interfering with commerce under 18 U.S.C. § 1951, (2) possession of a firearm during a crime of violence under 18 U.S.C. § 924(c)(1), and (3) first degree murder under 18 U.S.C. § 924(j)(1). Each count of the indictment also alleged aiding and abetting under 18 U.S.C. § 2.

[4]The Third Superseding Indictment charged the Hodge brothers and their co-defendant with (1) interfering with commerce under 18 U.S.C. § 1951, (2) first degree murder under 18 U.S.C. § 924(j)(1), and (3) tampering with a witness by killing under 18 U.S.C. § 1512(a)(1)(A), (2)(A).

discussions about a plea bargain. The United States Attorney wrote in July 1999 that the government was "seriously considering" asking that Devin plead guilty to first degree murder and possession of a firearm in relation to a crime of violence. In return, the government would recommend that Devin be sentenced at the lower end of the guideline range and that he receive the maximum, three-point credit for extraordinary acceptance of responsibility under the United States Sentencing Guidelines.

In late-April 2000, the government sent Devin's attorney a draft plea agreement. The body of the cover letter stated:

> I am enclosing herewith a copy of a proposed plea agreement in the above captioned matter. The proposed agreement is the entire integrated agreement of the parties. Additionally, the plea offer from the government is a lock plea. That is, each of your clients must accept the plea as a condition of the government's acceptance of the plea.
>
> As you know, while the government will recommend three points off for extraordinary acceptance of responsibility if your clients each accept the plea, the government is not the final arbiter of what United States Sentencing

5

Guidelines range the United States Probation Office may calculate. As such, the government makes no representation as to what probation's [sic] calculations, or the Court's position on those calculations, may be.

Four days after receiving this letter, Devin pleaded guilty. The written plea agreement provided that Devin would plead guilty to first degree murder, the second count of the Third Superseding Indictment. In return, the government agreed to "seek dismissal" at sentencing of the remaining counts, and to "recommend that [Devin] receive credit for acceptance of responsibility, assuming [Devin] does in fact clearly demonstrate acceptance of responsibility." While the government reserved its right to allocute at sentencing, it agreed "to make no specific sentencing recommendation other than to request that the sentence be within the guideline range."

The final paragraph of the written plea agreement provided that "[t]he parties agree that no other promises have been made in connection with this matter, and that this Plea Agreement constitutes the entire agreement between the United States Attorney for the District of the Virgin Islands and the defendant in the above-referenced case." The agreement did not mention that Devin's plea was "locked," or otherwise conditioned upon, Irvine's identical plea.

6

Later that month, the District Court held a joint change-of-plea hearing for Devin and Irvine. Devin's and Irvine's attorneys indicated that the pleas were identical and agreed to a "dual inquiry." District Judge Moore stated:

> Even though you've gone over and completed an application to plead guilty, each of you, and a separate plea agreement which it appears to me has – when I looked at it before – has been signed, I want to make sure that I have – that the file reflects what you and your attorneys have gone over individually.

Devin and Irvine reviewed their individual applications and their plea agreements, and they and their attorneys initialed each page of those documents.

Judge Moore explained separately to Devin and Irvine that the maximum penalty for pleading guilty to first degree murder was death. Devin's attorney objected, noting that his client was a minor at the time of the offense. When the government conceded that the death penalty would not apply to Devin, Judge Moore responded, "[a]nd the government agrees for both Mr. Irvine Hodge and Mr. Devin Hodge, that death is not an option[?]" The government agreed. Judge Moore summarized that, "[s]o for all legal and practical purposes, insofar as these two defendants, Mr. Irvine Hodge, Jr. and Mr. Devin Hodge, the maximum possible sentence is

7

life imprisonment[?]"  Both Devin's and Irvine's counsel agreed.

Judge Moore asked Devin whether he understood what the government had promised to do in return for his guilty plea.  Devin answered, "Yes, your Honor."  Prompted by Judge Moore, Devin elaborated: "Well, I understand it would be in a guideline range.  Also I understand – well, the charges I'm being charged with, what would be dropped."  Judge Moore summarized: "So the government, once we arrive at a guideline range, the government will recommend that the sentence be within that, and they're not going to ask for any particular sentence, except that it be within that range."  Devin answered in the affirmative.  "Is there anything else about the agreement you don't understand that we need to go over?" Judge Moore asked.  "No, I understand everything fully," Devin answered.

Devin and Irvine were questioned separately regarding rights they were waiving by pleading guilty.  Judge Moore asked:  "Do you understand our system, and that you don't have to give [your rights] up, nobody can force you to give them up, but if you do waive those rights, what you'll do if you plead guilty, then they'll be waived and the next thing will be the sentencing?"  The brothers each answered affirmatively.  Judge Moore added, "you understand also that you have the privilege against self-incrimination, which means that you have the right to stand on your plea of not

8

guilty and to remain silent.  No one can force you to testify against yourself or to give other incriminating testimonial evidence, indicating that you're guilty as charged?"  Again, the brothers answered affirmatively.

Judge Moore then homed in on voluntariness:

The Court:     Now, you are the only ones who can plead – change your plea to a charge, this Count 2, and it's – your plea [is] valid only if it's your free and voluntary act.  So, Mr. Irvine Hodge, has anyone forced you in any way to enter a plea to this charge?

Irvine:     No, Your Honor.

The Court:     Anybody threatened you or promised you something?

Irvine:     No, Your Honor.

The Court:     When I say "promised," I'm talking about something other than what we went over in the plea agreement.

Irvine:     No, Your Honor.

The Court:     How about you, Mr. Devin Hodge; anyone forced you,

9

|              |                                          |
|--------------|------------------------------------------|
|              | forcing you now or bring any kind of pressure on you to coerce you in changing your plea? |
| Hodge:       | No, Your Honor. I'm doing it of my own. |
| The Court:   | I'm sorry?                                |
| Hodge:       | I did it on my own will.                  |
| The Court:   | All right. Thank you. So Mr. Irvine Hodge, if you were to enter a plea of guilty, it would be your own free and voluntary act? |
| Irvine:      | Yes, Your Honor.                          |
| The Court:   | Mr. Devin Hodge, you've already agreed that that's the case? |
| Hodge:       | Yes, Your Honor.                          |

Both Irvine and Devin pleaded guilty to the second count of the Third Superseding Indictment.

In March 2002, Devin, Irvine and their co-defendant were sentenced at the same hearing. At the hearing, Judge Moore announced that he would hear allocutions from both Devin and Irvine. Devin's attorney responded: "Your Honor, I hope by your hearing both allocutions, that the Court is not fixed on a predisposition to sentence these brothers equally."

10

Judge Moore replied: "Not necessarily. That's why I want to hear both of them."

Devin's attorney argued that, pursuant to a provision of the plea agreement, Devin had shown such extraordinary acceptance of responsibility that the District Court should depart downward five points from the Guidelines. The attorney argued that Devin had been a "totally ignorant boy" at the time of the Emerald Lady robbery and "fastidiously" had turned his life around. Government counsel countered that it was unlikely that Devin had turned his life around, as the pre-sentencing report noted that Devin also was charged with a murder that occurred five months after the murder at the Emerald Lady. He concluded:

> [T]he point is, Your Honor, that someone that evil, to have complete transformation in a four-year period, it begs the question, is it genuine or isn't it?
>
> And does the community at large have to wonder, once his sentence is completed and he's released back into the community, whether it's a genuine change or not.
>
> . . .
>
> We ask the Court to fashion a sentence that is fair, that is just, but that is also fair and just to [the victims of the shooting] and their families. Because Devin Hodge had his chance to be a positive influence in the community.

Larry Davis [the owner of the Emerald Lady] was a positive influence in this community. He doesn't get a second chance. His family doesn't get a second chance. Gwendolyn Rawlins' life has been completely traumatized. She doesn't have a second chance. . . .

Once again, Mrs. Rawlins has asked to speak to the Court, but I ask the Court to fashion a sentence that is fair and just to the victims in this case.[5]

After hearing a victim impact statement from Mrs. Rawlins, who asked that Devin "bear the full penalty of the law," Judge Moore concluded that, in light of his knowledge of the case, what he had heard at the change-of-plea hearing, and the terms of the plea agreement, he had no alternative but to sentence both of the Hodge brothers to life in prison. The District Court entered its judgment, noting Devin's guilty plea and his life sentence, on March 6, 2002. Devin filed a notice of appeal on March 26, 2002, arguing solely that the District Court ignored Third Circuit law on "exceptional post[-]offense rehabilitation."[6]

---

[5]Gwendolyn Rawlins, a security guard at the Emerald Lady, was injured during the robbery.

[6]The District Court exercised jurisdiction over this case under 48 U.S.C. § 1612 (providing the District Court of the Virgin Islands the jurisdiction of a District Court of the United States) and 4 V.I.C. § 32 (providing the District Court of the Virgin Islands original jurisdiction in all causes arising under the Constitution,

## II.

### A.

Devin argues on appeal that at his sentencing the government reneged on its promise in the plea agreement to recommend no specific sentence.  He contends the government implicitly requested a life sentence by rhetorically asking, "does the community at large have to wonder once his sentence is completed and he's released back into the community, whether it's a genuine change or not?"  He also maintains that the government impliedly sought a life sentence by asking for a sentence that was "fair and just" to the victims of his alleged crime, including the wife of the deceased owner of the Emerald Lady.  Even if such breaches were inadvertent, Devin contends, vacatur of his sentence would be required because under *Santobello v. New York*, 404 U.S. 257 (1971), prosecutors must carefully be held to plea agreements.[7]

While Devin does not claim to have raised his breach-of-plea argument at sentencing, we may consider that argument under *United States v. Moscahlaidis*, 868 F.2d 1357

---

treaties, and laws of the United States).  We have appellate jurisdiction under 28 U.S.C. § 1291 over this timely appeal from a final order.  *See Hodge*, 211 F.3d at 75.

[7]Devin adds other breach-of-plea arguments on appeal, including that the government failed to advise the District Court of the nature and extent of his cooperation.  We do not reach these arguments, as we conclude on other grounds that the government breached its agreement.

(3d Cir. 1989). There, the government argued that the defendant-appellant waived his breach-of-plea argument by failing properly to object at his sentencing hearing. 868 F.2d at 1360. "Even if we agree that appellant did not properly object to the plea agreement violation at the sentencing hearing," we stated, "such failure does not constitute a waiver." *Id*. We rejected the notion that breach-of-plea arguments should be reviewed for plain error, and instead held that we must exercise plenary review. *Id*. *See also United States v. Queensborough*, 227 F.3d 149, 156 (3d Cir. 2000) ("whether the government violated the terms of a plea agreement is a question of law subject to plenary review").

We have considered in numerous precedential opinions whether the government breached a plea agreement by what it said at sentencing. While our inquiry in such cases tends to be fact-specific, the basic rules are clear. The government must "adhere strictly to the terms of the bargains it strikes with defendants." *Queensborough*, 227 F.3d at 156.[8]

---

[8]This doctrine frequently is traced to *Santobello*, which states:

> This phase of the process of criminal justice, and the adjudicative element inherent in accepting a plea of guilty, must be attended by safeguards to insure the defendant what is reasonably due in the circumstances. Those circumstances will vary, but a constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such a promise must be fulfilled.

14

Because defendants entering pleas forfeit a number of constitutional rights, "courts are compelled to scrutinize closely the promise made by the government in order to determine whether it has been performed." *Id*. The question for a reviewing court is "whether the government's conduct is consistent with the parties' reasonable understanding of the agreement." *Id*. In other words, we apply contract law standards to plea agreements; a "rigidly literal" interpretive approach is not allowed. *United States v. Nolan-Cooper*, 155 F.3d 221, 236 (3d Cir. 1998).

The logical thread running through our relevant cases is most easily traced chronologically. In *United States v. Crusco*, 536 F.2d 21 (3d Cir. 1976), the government promised to take no position on sentencing. *Id*. at 23. Yet, at the sentencing hearing, the prosecutor stated that, "[a]s to defendant's status, elevation in organized crime hierarchy. . . . I think this shows the type of individual he is. I think it shows the importance in organized crime that he has and also shows the danger to the community that this man has by being out on the street." *Id*. at 25. We held that the government's characterization was "a transparent effort to influence the severity of [appellant's] sentence." *Id*. at 26. We reasoned that "[o]nly a stubbornly literal mind would refuse to regard the Government's commentary as communicating a position on sentencing[,]" and concluded that "[t]he government's final argument that it would have breached the plea bargain only if it had actually recommended the terms of a sentence is thus answered. We believe that such a strict and narrow interpretation of its commitment is untenable and we must

404 U.S. at 262-63.

15

reject it." *Id*. at 26. On remand, the appellant was allowed to withdraw his guilty plea. *Id*. at 27.

In contrast, the prosecutor in *United States v. Miller*, 565 F.2d 1273 (3d Cir. 1977) (per curiam), pledged to make no recommendation regarding the sentence to be imposed. *Id*. at 1274. At the sentencing hearing, the government argued that the appellant's crime could not be excused by inducement because the alleged inducement occurred a year-and-a-half before the crime. *Id*. at 1274. The appellant maintained that this statement amounted to a sentencing recommendation. We explained that, under *Crusco*, the promise to *take no position as to sentencing* was different than the promise to *make no recommendation as to the terms* of the sentence. *Id*. at 1275. We concluded that *Miller* presented the latter situation:

> Here, the Government has specifically promised only not to make recommendation as to the sentence. The difference between the terms is elementary, for the promise not to recommend is narrow, speaking only to the sentence to be imposed, whereas a promise to take no position speaks to no attempt at all to influence the defendant's sentence.

*Id*. Accordingly, we held that the government did not breach its agreement not to recommend a sentence by arguing that the appellant's excuse for his criminal activity was invalid, and we affirmed the District Court's judgment. *Id*.

We further elaborated on the distinction between

16

taking no position as to a sentence and not recommending a sentence in *Moscahlaidis*. In that case, the government vowed that it would "not take a position relative to whether or not a custodial sentence shall be imposed on [appellant] but . . . will recommend to the sentencing Judge that if a custodial sentence is imposed on [appellant], it will not exceed one year." *Id*. at 1358. In its sentencing memorandum, the government referred to the appellant's "moral bankruptcy," denounced his "demonic" efforts to preserve his "fetid empire," and stated that he was "not just a white-collar criminal." *Id*. at 1359. The memorandum concluded that, per its plea agreement, the United States would not recommend a sentence; "however, should the court elect to impose a custodial sentence on [appellant], the United States is bound to recommend that the custodial term not exceed one year imprisonment." *Id*. The memorandum added that "[t]his recommendation is part of the plea agreement between the defendant and the United States. It is not binding upon the court." *Id*.

We rejected the government's argument that it kept its agreement. "If the government wanted to be limited only to not recommending a sentence," we declared, "it should have promised not to recommend a sentence. Instead, the prosecutor promised to take no position as to whether a custodial sentence should be imposed. The government must strictly comply with the terms of the agreement it made with appellant." *Id*. at 1362-63. We held "that the statements made by the prosecutor which offered opinions and drew conclusions about appellant's character violated the terms of the plea agreement." *Id*. Further, we held that the government's "comment about [appellant] not being 'just a

17

white collar criminal' was taking [a] position relative to whether a custodial sentence be imposed and thus violated the plea agreement." *Id*. We explained that in this Circuit "the rule is to remand the case to the district court for it to determine whether to grant specific performance or allow withdrawal of the plea." *Id*.

In the present case, the government promised to "make no specific sentencing recommendation other than to request that the sentence be within the guideline range." We first must determine what Devin "reasonably understood [he] would be receiving from the government in return for [his] plea of guilty." *Nolan-Cooper*, 155 F.3d at 239. Though "reasonably understood" suggests a partially subjective inquiry, in practice the inquiry is purely objective. *See id.* (stressing the plain language of the agreement and eschewing a "rigidly literal" interpretive approach). We conclude that a reasonable person would have understood the plain language of Devin's plea agreement to mean that the government would not make any specific sentencing recommendation. The government apparently agrees, as it argues that nothing it said at sentencing "explicitly, indirectly, or tacitly recommended a life sentence."

The government broke its promise. The prosecutor asked "whether the community at large [had] to wonder, once [Devin's] sentence is completed and he's released back into the community, whether [he made] a genuine change or not." The plain implication of that statement was that Devin should not be released back into the community. The prosecutor added that Devin "had his chance to be a positive influence in the community." The plain implication of that statement was

18

that Devin should not be given another chance to be a positive influence in the community. The prosecutor stated that the murder victim did not get a second chance to be a positive influence in the community and urged the Court to "fashion a sentence that is fair and just to the victims in this case." The plain implication of that statement was that a fair and just sentence for Devin would deny him a second chance.[9] In short, "[o]nly a stubbornly literal mind would refuse to regard the Government's commentary as communicating a [specific recommendation] on sentencing." *Crusco*, 536 F.2d at 26. By recommending a "life sentence in all but name," *United States v. Pollard*, 959 F.2d 1011, 1024 (D.C. Cir. 1992), the government breached its agreement with Devin.

This holding accords with *Moscahlaidis*, *Miller*, and *Crusco*. In *Moscahlaidis*, we warned that "[i]f the government wanted to be limited only to not recommending a sentence, it should have promised not to recommend a sentence. Instead, the prosecutor promised to take no position . . . . The government must strictly comply with the terms of the agreement it made with appellant." 868 F.2d at 1358. Here, evidently seeking to leave its allocution options open, the government not only promised not to recommend a sentence, it promised not to recommend a "specific" sentence. Fairly construing its allocution, however, the government breached even that narrow promise. While *Moscahlaidis* and *Miller* encourage the government to use "no recommendation" language to preserve linguistic leeway at

---

[9]We think this is especially true given that Mrs. Gwendolyn Rawlins, one of Devin's alleged victims, asked at sentencing that Devin "bear the full penalty of the law."

19

sentencing, that leeway is not infinitely elastic. Indeed, *Moscahlaidis* declares that the government will be "limited" to its promise not to recommend a sentence. *Id.* As the government here exceeded those broad limits, this case aligns with *Moscahlaidis* or *Miller*, and fundamentally fits with *Crusco*. As in *Crusco*, we will remand for the District Court to determine whether to grant specific performance or allow withdrawal of the guilty plea. *See Moscahlaidis*, 868 F.2d at 1358.[10]

**B.**

Devin further argues on appeal that the District Court's plea colloquy was deficient because the District Judge did not know Devin's plea was contingent on Irvine's identical plea,

[10]We believe our decision today also accords with the holding in *Pollard*, which somewhat resembles this case. In *Pollard*, the government "stated it would seek a 'substantial period of incarceration,' but agreed not to ask for a life sentence." 959 F.2d at 1022. Pollard maintained that the government's forceful allocution implied to the district judge that a life sentence was appropriate. *Id.* at 1024; *see also id.* at 1035 ("the repeated use of superlatives implied an appeal for the maximum.") (Williams, J., dissenting). The majority held that the district court avoided clear error in concluding otherwise, explaining that "[t]he government did not ask for a 'life sentence in all but name,' because it never introduced explicitly or implicitly the notion or concept of a maximum sentence; nor did it ever use words that could be thought synonymous with a life term." *Id.* at 1024 (Silberman, J., joined by Ginsburg, R. B., J.). In contrast to *Pollard*, here the government introduced, implicitly, the notion of a maximum sentence; indeed, it did so clearly and repeatedly. Consequently, even if we were to apply *Pollard*'s deferential standard of review, we have no doubt that the government violated its plea agreement.

and vice versa. Had the District Court been properly informed about the package deal and had Devin been properly questioned, he contends that he would have been dissuaded from pleading guilty. He adds that the District Court also erred by failing to ask whether his willingness to plead guilty "result[ed] from prior discussions between the attorney for the government and the defendant or the defendant's attorney." Fed. R. Crim. P. 11(d) (repealed in relevant part); *United States v. Mustafa*, 238 F.3d 485, 491 (3d Cir. 2001).

*United States v. Vonn*, 535 U.S. 55 (2002), held that a defendant who fails to object to Rule 11 error must carry the burden of showing on appeal that the error was "plain, prejudicial, and disreputable to the judicial system." *Id*. at 65. In other words, a defendant must show that: "(1) an error was committed; (2) the error was plain, that is, clear and obvious; and (3) the error affected the defendant's substantial rights." *United States v. Dixon*, 308 F.3d 229, 234 (3d Cir. 2002) (quoting *United States v. Syme*, 276 F.3d 131, 143 (3d Cir. 2002)). When those elements are satisfied, an appellate court in its discretion may order a correction if the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id*. (citing *United States v. Stevens*, 223 F.3d 239, 242 (3d Cir. 2000)).

We conclude that the District Court did not commit plain error during the Rule 11 colloquy. Though the terms of the packaging agreement have not been disclosed to us, the government does not dispute that Devin's and Irvine's pleas were locked. And, indeed, the government's cover letter to the final draft plea agreement states that the pleas were "lock[ed]." As we explain below, other Courts of Appeals

21

require disclosure of such arrangements to the district court, which must exercise special care at the Rule 11 colloquy to ensure that each participant pleads voluntarily. Until today, however, that was not the law in this Circuit. Heretofore, we have discussed package deal plea bargains only in dicta, and there stated simply that such bargains are "permissible provided that the defendant's decision to forego trial is otherwise voluntary." *United States v. Seligsohn*, 981 F.2d 1418, 1426 (3d Cir. 1992) (noting that voluntariness of appellant's plea was "not properly before" the Court). Consequently, even if the District Court had been informed that Devin's plea was packaged, we cannot say that failure to conduct Devin's colloquy with special care would have been "clear and obvious" error. *Dixon*, 308 F.3d at 233-34. *Cf. United States v. Abbott*, 241 F.3d 29, 34 (2d Cir. 2001) ("[T]he disclosure of the existence of a package deal is crucial at the Rule 11 hearing *so that* the district court may probe as deeply as needed into the possibility that one defendant is pleading guilty against his will . . . .") (emphasis added). It follows *a fortiori* that failure to provide special care was not clear and obvious error where, as here, the District Court was not informed of the package deal.[11]

Nor can we say that the District Court plainly erred in failing to ask Devin about prior discussions with the government under Rule 11(d). Since Devin's colloquy in 2000, Rule 11(d) has been moved and changed. Now, Rule

---

[11]Absent clear error, we need not consider whether the District Court's Rule 11 colloquy affected Devin's substantial rights or jeopardized the fairness, integrity, or public reputation of judicial proceedings. *See Dixon*, 308 F.3d at 233-34.

11(b)(2), rather than Rule 11(d), addresses voluntariness, and the reference to prior discussions has been deleted. The Supreme Court has instructed that, "in the absence of a clear legislative mandate, the Advisory Committee Notes provide insight into the meaning of a rule, especially when, as here, the rule was enacted precisely as the Advisory Committee proposed." *Vonn*, 535 U.S. at 63 n.6. We think the omission of references in the new Rule 11 to prior discussions establishes a "clear legislative mandate" that such references are unnecessary to conduct an adequate Rule 11 colloquy. If there were any doubt on that issue, the Advisory Committee explains that the old requirement, "often a source of confusion to defendants who were clearly pleading guilty as part of a plea agreement with the government, was considered unnecessary." Advisory Committee's Notes on 2002 Amendments to Fed. R. Crim. P. 11. Whether or not the District Court committed a "clear and obvious" error that affected Devin's substantial rights, it is thus clear that the District Court's omission did not "seriously affect the fairness, integrity, or public reputation" of the District Court's proceedings. *See Dixon*, 308 F.3d at 233-34.

While we hold that the District Court committed no plain error, we believe that determining voluntariness in package deal situations is an especially delicate matter. We therefore write to provide guidance to the District Court should a new plea colloquy be necessary on remand, and to assist future district courts considering such pleas.

As their name suggests, package deal plea bargains exist where the government accepts a defendant's guilty plea on the condition that his co-defendant(s) also plead guilty.

23

The incentive to join such arrangements is straightforward: the government offers defendants a "volume discount - a better deal than each could have gotten separately." *United States v. Caro*, 997 F.2d 657, 658 (9th Cir. 1993). Of course, the benefits of such deals are seldom distributed evenly, and every defendant may not be equally interested in bargain shopping. Familial or fraternal coercion of putative confederates in package plea deals is a serious concern, *see United States v. Mescual-Cruz*, 387 F.3d 1, 7 (1st Cir 2004), as to some extent is self-imposed pressure. *See id.*; *United States v. Marquez*, 909 F.2d 738, 742 (2d Cir. 1990). Though reserving judgment on the question, the Supreme Court has warned that "offers of leniency or adverse treatment for some person other than the accused . . . might pose a greater danger of inducing a false guilty plea by skewing the assessment of the risks a defendant must consider." *Bordenkircher v. Hayes*, 434 U.S. 357, 365 n.8 (1977). Mindful of these considerations, other Courts of Appeals widely require that (1) package plea deals be disclosed to the court[12] and (2)

---

[12]*United States v. Daniels*, 821 F.2d 76, 78-79 (1st Cir. 1987) (Breyer, J.) (holding that government failure to tell court at Rule 11 hearing that plea was packaged violated Rule 11); *United States v. Clements*, 992 F.2d 417, 419 (2d Cir. 1993) (per curiam) (stating that disclosure of plea packaging is the "preferred practice" and the "more prudent course," and that packaging "should be stated to the court."); *United States v. Bennett*, 332 F.3d 1094, 1101 (7th Cir. 2003); *United States v. Caro*, 997 F.2d 657, 659-60 (9th Cir. 1993); *United States v. Holland*, 117 F.3d 589, 594 (D.C. Cir. 1997) (district court "should be informed" about plea packaging). *See United States v. Morrow*, 914 F.2d 608, 613 (4th Cir. 1990) (stating that failure to inform court of packaged pleas "raise[d] eyebrows" of Court of Appeals). *Cf. United States v. Usher*, 703 F.2d 956, 958-59 (6th Cir. 1983) (holding that District

colloquies with package plea participants be conducted with special care.[13] We agree, and adopt these requirements for district courts in this Circuit considering packaged pleas.

There is no question that package deal plea bargains are constitutional. *See Pollard*, 959 F.2d at 1021-22 (citations omitted). That conclusion is nearly axiomatic given the nature of our criminal justice system, of which plea bargains are an "essential part." *Santobello*, 404 U.S. at 261; *see also*

Court did not err in not "raising *sua sponte* the possibility of conditions [on defendant's plea] even though appellant and his co-defendant were husband and wife and even though both pleaded guilty at the same time").

[13]*United States v. Tursi*, 576 F.2d 396, 398 (1st Cir. 1978) (holding that "special care must be taken to ascertain the voluntariness of the [packaged] guilty plea"); *Harman v. Mohn*, 683 F.2d 834, 837-38 (4th Cir. 1982); *Usher*, 703 F.2d at 958; *Politte v. United States*, 852 F.2d 924 (7th Cir. 1988); *United States v. Castello*, 724 F.2d 813, 815 (9th Cir. 1984). *See United States v. Nuckols*, 606 F.2d 566, 570 (5th Cir. 1979) (holding that special care must be taken to determine voluntariness where plea agreement is "made in consideration of lenient treatment as against third persons"); *United States v. Wright*, 43 F.3d 491 (10th Cir. 1994) (same). *See also Martin v. Kemp*, 760 F.2d 1244, 1247 (11th Cir. 1985) (holding that evidence as to voluntariness of guilty plea, allegedly entered in exchange for leniency toward defendant's pregnant wife, was not sufficiently developed on collateral review) (citing *Nuckols*, 606 F.2d at 569). *But see United States v. Gamble*, 327 F.3d 662 (8th Cir. 2003) (requiring, implicitly, no special care where pleas are packaged); *LoConte v. Dugger*, 847 F.2d 745, 753 (11th Cir. 1988) (same; collateral review); *United States v. Farley*, 72 F.3d 158, 164 (D.C. Cir. 1995) (requiring "more searching inquiry" at Rule 11 colloquy only if defendant expresses reluctance when asked about threats or coercion).

*Blackledge v. Allison*, 431 U.S. 63, 71 (1977). "While confronting a defendant with the risk of more severe punishment clearly may have a discouraging effect on the defendant's assertion of his trial rights," the Supreme Court has explained, "the imposition of these difficult choices [is] an inevitable – and permissible – attribute of any legitimate system which tolerates and encourages the negotiation of pleas." *Bordenkircher*, 434 U.S. at 364. In turn, the Second Circuit has noted that, "[s]ince a defendant's plea is not rendered involuntary because he enters it to save himself many years in prison, it is difficult to see why the law should not permit a defendant to negotiate a plea that confers a similar benefit on others." *Marquez*, 909 F.2d at 742. We agree and hold that package deal plea bargains are constitutionally permissible. *See Seligsohn*, 981 F.2d at 1426.

Though allowed, package deal pleas pose special risks, particularly when a trial court is unaware that defendants' pleas are tied together. The First Circuit, which has an extensive jurisprudence in this area, most often has reversed package deal pleas when the district court was not informed of the packaging. *Mescual-Cruz*, 387 F.3d at 8. According to the First Circuit's sound reasoning, when a defendant's plea rests on a promise by the government that another defendant will benefit, that promise is a material term of the agreement. *Abbott*, 241 F.3d at 33. *See also United States v. Hernandez*, 79 F.3d 1193, 1194 (D.C. Cir. 1996). And, of course, "[f]ull disclosure to the district court of the material terms of plea agreements is necessary to insure that the Rule 11 colloquy is thorough and searching as to defendant's knowing, intelligent, and voluntary waiver of the right, among others, to a jury trial." *Abbott*, 241 F.3d at 33. We therefore hold that the

26

parties must notify the district court that a package deal exists and state to the court on the record the specific terms of that deal. *See* Fed. R. Crim. P. 11(c)(2) ("The parties must disclose the plea agreement in open court . . . ."); *Hernandez*, 79 F.3d at 1194 (citing *United States v. Roberts*, 570 F.2d 999, 1007 n.25 (D.C. Cir. 1977)).[14]

Once a court has been told of a package deal, special care should be exercised during the Rule 11 plea colloquy to ensure that the defendant is pleading voluntarily. Other Courts of Appeals have studiously declined to dictate detailed "special care" marching orders. *See*, *e.g.*, *Mescual-Cruz*, 387 F.3d at 8 ("We have not . . . mandated that extra procedures be followed . . . ."). We share their caution. More than three decades ago, the Supreme Court warned that the "[t]he nature

---

[14]Two Courts of Appeals have suggested that the duty to disclose plea packaging "falls with particular weight on prosecutors[,] who have a responsibility not merely to win, but to win fairly." *Caro*, 997 F.2d at 659 n.2; *Clements*, 992 F.2d at 419 (recommending prosecutorial disclosure as the "preferred practice"). Other Courts of Appeals expressly require prosecutorial disclosure yet are silent regarding defense counsel's commensurate duty, if any. *Mescual-Cruz*, 387 F.3d at 9 (requiring prosecutorial disclosure); *Bennett*, 332 F.3d at 1101 (same). We of course recognize that defendants, not prosecutors, face the danger of skewed assessment of risks when package deal plea bargains are at stake. *See Bordenkircher*, 434 U.S. at 365 n.8. Descriptively, prosecutors thus may be more likely actually to disclose package deal pleas than their counterparts. But that does not absolve defense counsel from their express duty under Rule 11 to notify the court of the material terms of the plea agreement. Prescriptively, as officers of the court, defense counsel have no less of a duty to follow the rules of disclosure than prosecutors. That duty includes disclosing that a plea bargain is a package deal.

of the inquiry required by Rule 11 must necessarily vary from case to case," *McCarthy v. United States*, 394 U.S. 459, 467 n.20 (1969), and it recently reiterated that "Rule 11 should not be given such a crabbed interpretation that ceremony was exalted over substance." *Vonn*, 535 U.S. at 70. With Rule 11, Congress decided to "strip district judges of freedom to decide *what* they must explain to a defendant who wishes to plead guilty, but not to tell them precisely *how* to perform this important task in the great variety of cases that would come before them." *United States v. Saft*, 558 F.2d 1073, 1079 (2d Cir. 1977) (Friendly, J.) (emphasis in original). As Rule 11 does not suggest that its requirements can be met solely by reading its elements verbatim, *id*., we think it would be presumptuous for us to add to the Rule our own miniature litany.

What then in general terms is "special care"? At the threshold, a district court notified of a package deal plea bargain should question counsel closely to ensure that the precise terms of the package plea deal are on the record. *See* Fed. R. Crim. P. 11(b)(2), 11(c)(2). Once it is clear exactly how a defendant's plea benefits his confederate(s), it may be helpful to ask who first proposed the package deal, *see United States v. Politte*, 852 F.2d 924, 930-31 (7th Cir. 1988), how extensively defense counsel was involved in developing the deal, *see United States v. Usher*, 703 F.2d 956, 958 (6th Cir. 1983), and what benefit the defendant expects to gain from the deal. *See United States v. Buckley*, 847 F.2d 991, 995 (1st Cir. 1988). When asking whether a plea is a product of force, threats, or inducements and the like, a district court should take care not to ask only whether the *prosecutor* forced, threatened, or coerced the defendant, but whether anyone did so. *United States v. Martinez-Molina*, 64 F.3d 719, 734 (1st Cir. 1995). Having so inquired, the court should be particularly attuned to even mild expressions of reluctance by a defendant. *See United States v. Farley*, 72 F.3d 158, 164

(D.C. Cir. 1995); *United States v. Daniels*, 821 F.2d 76, 79 (1st Cir. 1987). Such expressions always should trigger a more searching inquiry. *See Farley*, 72 F.3d at 164. On the other hand, as none of the defendants may be particularly eager to plead guilty, one defendant's expressions of reluctance should be compared to those of other defendants involved in the package deal. *See United States v. Morrow*, 914 F.2d 608, 613 (4th Cir. 1990) (refusing to grant writ of habeas corpus where son claimed to have pleaded involuntarily, but testimony indicated that father claimed at change-of-plea hearing that *he* was pleading to help son).

The foregoing is not a checklist that, if followed, automatically will prevent a Rule 11 colloquy from going awry. Rather, it is a summary of lessons drawn from colloquies evaluated by other Courts of Appeals. The overarching rule is that a district court considering a package plea deal should be particularly attentive to a defendant's responses to voluntariness questions throughout a plea colloquy. That being said, district courts of course should remember that package deal plea bargains are not inherently coercive, and that the judge's goal is not to doom the deal but simply to ensure that the defendant's plea is voluntary.

We recognize that Rule 11 colloquies have grown in length since their formal adoption, *Vonn*, 535 U.S. at 62, and we only cautiously augment their manifold considerations. *United States v. Clements*, 992 F.2d 417, 420 (2d Cir. 1993). Nevertheless, when the government risks inducing false guilty pleas by packaging pleas together, *Bordenkircher*, 434 U.S. at 365 n.8, justice and prudence require that the district court be notified and pay special care.

### III.

For the foregoing reasons, we will vacate the sentence

of the District Court and remand Devin Hodge's case for re-sentencing or withdrawal of his guilty plea.